# CURRY *v.* THE DISTRICT OF COLUMBIA.

CRIMINAL LAW; HACK STANDS; POLICE REGULATIONS; RAIL-
ROADS; CONSTITUTIONAL LAW.

1. Under the police regulation of the Commissioners of this District,
   of October 20, 1898, setting apart a hack stand in a public
   street for the exclusive use of the Philadelphia, Wilmington
   & Baltimore Railroad Company, but providing no penalty for
   its violation, a licensed public hackman intruding upon that
   stand is guilty of no crime or misdemeanor.
2. The joint resolution of Congress of June 7, 1898, authorizing the
   Commissioners of this District to locate hack stands on streets
   adjoining the stations of any railroad companies in the District,
   the hack service to be established by such companies, gave the
   Commissioners no right to grant any concession of hack stand
   privileges to the Philadelphia, Wilmington & Baltimore Rail-
   road Company, which has no station and has no existence by
   legislative recognition in this District.
3. The police regulation of the Commissioners of this District of
   October 20, 1898, setting apart that portion of the public streets
   adjoining the Baltimore & Potomac Railroad station, for the
   exclusive use of the hack service of the Philadelphia, Wilming-
   ton & Baltimore Railroad Company, was not authorized by the
   joint resolution of Congress of June 7, 1898, and is void and
   unconstitutional as giving exclusive privileges to the railroad
   company and prohibiting all other persons from engaging in a
   lawful business at the place designated.
4. Such joint resolution of Congress can not be validly or properly
   construed in such manner as to justify the concession by the
   Commissioners of this District of any exclusive privileges in
   the premises.

No. 864. Submitted March 9, 1899. Decided April 4, 1899.

IN ERROR to the Police Court of the District of Columbia.
*Judgment reversed.*

The COURT in its opinion stated the case as follows:

This is an appeal from the judgment of the Police Court
of the District of Columbia, rendered in a proceeding insti-
tuted for the purpose of testing the validity of an ordinance

or regulation made by the Commissioners of the District with reference to a certain hack or cab stand adjacent to the station of the Baltimore and Potomac Railroad Company in this city.

The station is situated at the corner of Sixth and B streets. The building extends on the latter street 120 feet west from Sixth street, and on Sixth street it extends south 85 feet from B street; and south of this extend the sheds for the cars of the company, the storage of baggage and freight, and other purposes. It appears that a hack or cab stand had been established for several years on the two streets mentioned adjoining the station, and that any licensed hack or cab might occupy the stand, in the pursuit of its business. It is claimed that the service afforded by the ordinary hacks and cabs which were accustomed to occupy the stand was poorly and inefficiently performed; and that, therefore, a new cab service, with newer and better vehicles and a superior arrangement, was instituted by or in the name of the Philadelphia, Wilmington and Baltimore Railroad Company, a corporation chartered, as it would seem, under the laws of the States of Maryland, Delaware and Pennsylvania, and owning and operating a railroad in those States between the cities of Philadelphia, Wilmington and Baltimore, but hitherto unknown in the District of Columbia, except as a link in the so-called Pennsylvania system of railroads between the city of Washington and the city of New York. It is understood, however, that the Philadelphia, Wilmington and Baltimore Railroad Company is owned or dominated by the Pennsylvania Railroad Company, of the State of Pennsylvania, as is likewise the Baltimore and Potomac Railroad Company, the corporation of the State of Maryland which owns and operates, or heretofore at least has owned and operated, the railroad between the city of Baltimore and the city of Washington designated by its name, to which various Acts of the Congress of the United States have given the authority to enter

this District and the city of Washington, and which is and heretofore has been regarded as the owner of the station which has been mentioned. For reasons not disclosed, it is stated that the dominant power, the Pennsylvania Railroad Company, now operates the affairs of the Baltimore and Potomac Railroad Company, in the name of the Philadelphia, Wilmington and Baltimore Railroad Company; and the cab service which it has established in the city of Washington it has established in the name of the last mentioned company.

Application was made to the Congress of the United States for an exclusive license for this new cab system to occupy the hack and cab stand in the neighborhood of the station to the exclusion of all other owners of hacks and cabs; and the Congress refused to grant or authorize any such license. That body, however, enacted a joint resolution, approved June 7, 1898, which sought to empower the Commissioners of the District to take action in the matter. This joint resolution is in the following terms:

" Joint Resolution authorizing the Commissioners of the District of Columbia to locate a cab service, and for other purposes.

" *Resolved*, by the Senate and House of Representatives of the United States of America in Congress assembled,

" That the Commissioners of the District be, and they are hereby authorized to locate on the streets or parts of streets adjoining the stations of any railroad company in the District of Columbia, a stand for cabs, carriages and other vehicles for the conveyance of passengers to and from the said railroad stations, said service to be established by the said railroad companies; that the rates of charges for the service to be rendered by the said railroad companies shall be fixed by the Commissioners of the District of Columbia; and that at no time shall the schedule exceed the rates now in force in the city of Washington, District of Columbia."

Assuming to act in pursuance of this joint resolution of

Congress, the Commissioners of the District of Columbia, on October 20, 1898, enacted a regulation or ordinance which is in the following terms:

"*Ordered,* that so much of section 5 of article 4 of the police regulations in and for the District of Columbia as designates the following as hack stands, namely,—' on Sixth street near the Baltimore and Potomac Railroad Company's depot and on the south side of B street, N. W., west of the Baltimore and Potomac Railroad Company's depot,'—is hereby revoked; and that the space on Sixth street, from the building line of B street to the south line of the depot building, is reserved as a stand for the busses of licensed hotels; from the south line of said building southward in front of the train shed, for such use as the Philadelphia, Wilmington and Baltimore Railroad Company may desire to make of it for its business, including its cabs and the handling of freight, baggage and mail; that the space on B street, N. W. from the west line of the depot building, extending westerly 160 feet, is hereby set apart for the exclusive use of the cabs of the Philadelphia, Wilmington and Baltimore Railroad Company, as authorized by ' Joint Resolution authorizing the Commissioners of the District of Columbia to locate a cab service, and for other purposes.' "

(Signed by two of the three Commissioners.)

An act of Congress of January 26, 1887 (24 Stat. 368), had authorized and empowered the Commissioners of the District of Columbia "To make, modify, and enforce usual and reasonable police regulations in and for the said District," with reference to certain specified matters—among them the following: "to make needful regulations for the orderly disposition of carriages or other vehicles assembled on streets or public places," and "to establish and regulate the charges to be made by owners of hacks and hackney carriages of any kind whatsoever." And the authority of the Commissioners was further enlarged by another act of Congress of February 26, 1892 (27 Stat. 394), which empowered "them to make

and enforce all such reasonable and usual police regulations in addition to those already made under the Act of January 26, 1887, as they may deem necessary for the protection of lives, limbs, health, comfort, and quiet of all persons and the protection of all property within the District of Columbia."

Under date of July 1, 1898, the Commissioners of the District adopted and promulgated a code of police regulations, constituting a revision and amendment of previously existing regulations; and in and by one of the sections of these amended regulations certain places on several of the streets of the city of Washington were designated as stands for vehicles of the character hereinbefore referred to, two of which places were "on Sixth street near the Baltimore and Potomac Company's depot, such number and in such order as the superintendent of police may prescribe;" and "on the south side of B street northwest, west of the Baltimore and Potomac Railroad Company's depot, a number of vehicles at the discretion of the superintendent of police."

Under these regulations all owners of licensed hacks and their servants or agents were entitled to stand with their hacks on Sixth street and on B street, adjoining the Baltimore and Potomac Railroad Company's depot, to obtain the patronage of any persons who might wish to employ them; and this continued until the adoption of the regulation of October 20, 1898, hereinbefore mentioned. By the promulgation and enforcement of this regulation all vehicles, other than the busses of licensed hotels and the cabs of the Philadelphia, Wilmington and Baltimore Railroad Company, were wholly excluded from the stand or stands in question; for all the space on the side of the station fronting on Sixth street was specially assigned to the busses of licensed hotels and the uses of the Philadelphia, Wilmington and Baltimore Railroad Company; the space on B street to the north of the building was not a stand, and was left free for access to the building and egress from it; and the space of 160 feet westward from the west line of the station, assigned exclusively

to the cabs of the said last mentioned railroad company, was all the portion of B street that was available for the purpose of a hack stand, inasmuch as all of B street to the west of that, as far as Seventh street, was occupied by a street railroad company which had the terminus of its road at that point. This railroad, it may be remarked, passes upon B street along the north front of the station; and there are other street railroad tracks on Sixth street along the east side of the station; and it seems impossible, therefore, that any further portion of either street should be assigned or occupied for a hack stand.

Apparently for the purpose of testing the validity of the legislation and regulation in question, the appellant, on December 1, 1898, occupied, or sought to occupy, with his vehicle, for the purpose of soliciting custom, a part of the stand on B street assigned by the regulation of October 20, 1898, to the exclusive use of the Philadelphia, Wilmington and Baltimore Railroad Company for its cabs; and he was thereupon arraigned in the Police Court of the District for a violation of the ordinance. Upon a plea of "not guilty," an agreed statement of facts was made up and judgment was rendered against the appellant and a fine imposed. Upon a bill of exceptions duly taken, an appeal was allowed to this court.

*Mr. W. L. Cole* and *Mr. R. Newton Donaldson* for the plaintiff in error:

1. The regulation in question is neither usual nor reasonable. The test to be applied to all police regulations when their validity is called into question, according to all the authorities, is, "Are they necessary and proper to effectuate a purpose which has in view the public good?" If not then they are void, and the question whether they are reasonable or not is for the courts to decide under the circumstances of each case. *Moore* v. *District of Columbia,* 12 App. D. C. 537.

The police regulation here in question, if valid, involves the means of livelihood of probably a hundred men who will have to abandon their occupation. Serious as the consequences may be to these men, it is trifling to the injury that may be inflicted if this species of class legislation should be declared lawful by the courts. A very large part of the business transacted in large cities is necessarily subject to police regulation, and if Congress, either by direct legislation, or by authority delegated to the Commissioners of the District, may grant special privileges to one person, or class of persons, to the detriment of others, in the ordinary trades, callings and professions, which should be equally open to all, the consequences would be most far-reaching and no one can foresee the mischief to which it may lead. Constitutional provisions for the security of person and property should be liberally construed. Illegitimate and unconstitutional practices get their first footing by slight deviations from legal modes of procedure. It is the duty of the courts to be watchful for the constitutional rights of the citizen and guard them against stealthy encroachments. Their motto should be *obsta principiis.* *Boyd* v. *United States,* 116 U. S. 635.

Ordinances or by-laws of a municipal corporation must be reasonable, not inconsistent with its charter, nor with any statute, or the principles of the common law of the land, particularly those having relation to liberty of the citizen or the rights of private property; they must not be oppressive; they must be impartial, fair and general; they must not be in restraint of trade; they must not contravene common rights; the power, if conferred by the legislature, must not be in conflict with the Constitution; they must not be inconsistent with public legislative policy; they must not grant exclusive rights or create a monopoly. 1 Dillon Mun. Corp., Sec. 319 et seq., and cases cited in notes. See, also, *Slaughter House Cases,* 16 Wall. 62; *St. Louis* v. *Spiegel,* 90 Mo. 587; *Hayes* v. *Appleton,* 24 Wis. 542; *In re Sam*

*Kee*, 31 Fed. Rep. 680; *In re Quong Wah*, 13 Fed. Rep. 229; *Logan & Sons* v. *Payne*, 43 Iowa, 524; *Mayor* v. *Thorne*, 7 Paige, 261; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Lawton* v. *Steele*, 152 U. S. 137.

2. The Commissioners were not authorized by Congress to make and enforce the regulations complained of.

The language of the joint resolution of 1898 does not require or justify the Commissioners in making and enforcing a regulation which, like the one in question, gives the railroad companies a monopoly of the cab service at the railroad stations of the city, and takes away the right of all other cab owners to participate in that business. It ought not to be presumed that Congress invites the forming of a monopoly in any branch of industry. Every presumption should be against it. If the meaning of the joint resolution in question is doubtful, the doubt should be resolved against the idea that Congress intended to authorize the creation of a monopoly, and that the police regulation made by the Commissioners granting exclusive rights to the railroad company is in excess of the power conferred upon them. Cooley's Const. Lim. 485; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 545. The rules of construction require the courts to construe the law most strongly against the party claiming a monopoly, and it is only sustained, if at all, where it is given by the express language of the statute or by unavoidable implication. *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 666; *Stien* v. *Water Co.*, 141 U. S. 80.

3. If the regulation in question does create a monopoly as contended; if it is an unjust and unreasonable regulation; and if Congress has expressly authorized it, then Congress in so doing has exceeded its constitutional powers. 1 Sharswood's Blackstone, 127, note 8; *Slaughter House Cases*, 16 Wall. 115; Cooley's Const. Lim. 482–3; *Carfield* v. *Caryell*, 4 Wash. C. C. 380; *Wilkinson* v. *Leland*, 2 Pet. 627; *Cummings* v. *Missouri*, 4 Wall. 277; *Loan Assn.* v. *Topeka*, 20 Wall.

622; *Strauder* v. *West Va.*, 100 U. S. 310; *Munn* v. *Illinois*, 94 U. S. 123; *Yick Wo* v. *Hopkins,* 118 U. S. 369.

*Mr. S. T. Thomas,* Attorney for the District of Columbia; *Mr. A. B. Duvall,* Assistant Attorney, *Mr. George E. Hamilton, Mr. J. S. Flannery, Mr. Wayne MacVeagh,* and *Mr. Frederic D. McKenney* for the defendant in error:

Before discussing the several questions as to the constitutionality of the acts and police regulations and the validity and reasonableness of the action and regulation of the Commissioners of the District of Columbia involved in this case, the court's attention is directed to the following facts and conditions:

First. The cab stands in controversy are parts of the streets of Washington.

Second. These stands immediately adjoin the depot or station of the Baltimore and Potomac Railroad Company, of which the Philadelphia, Wilmington and Baltimore Railroad Company is the successor, and which depot is built upon a public reservation.

Third. The plaintiff in error is the driver of a licensed cab, owning and controlling no property abutting upon or adjoining said stands or parts of streets used for stands.

Fourth. The cabs of the railroad company are not authorized either by resolution of Congress or regulation of the Commissioners to do a general cab or hack business, but are limited "to the conveyance of passengers to and from said railroad stations."

1. The title of the United States to the streets of Washington, their right to exercise police power in the District of Columbia, and, through Congress, to delegate that power to the District of Columbia, are questions too well settled to be seriously controverted. *Van Ness* v. *Washington,* 4 Pet. 232.

The unrestricted right of Congress to legislate for said District, and to delegate its powers of police and municipal regulation to the Commissioners or other constituted agencies,

has been too often passed upon and maintained by the Supreme Court of the United States to be now brought in question. *Mattingly* v. *District of Columbia*, 97 U. S. 687; *Gibbons* v. *District of Columbia*, 116 U. S. 404; *Railroad Co.* v. *District of Columbia*, 132 U. S. 1; *Shoemaker* v. *District of Columbia*, 147 U. S. 282.

2. Under the act of January 26, 1887, and the joint resolution of February 26, 1892, and the joint resolution of June 7, 1898, the Commissioners had full authority to make the regulation in question. The right of the Commissioners to make regulations within the limits of the act of 1887, increased and broadened by the joint resolution of 1892, was considered and passed upon by this court in *Railroad Company* v. *The District of Columbia*, 10 App. D. C. 126.

The Commissioners, having the conceded right to designate cab stands, have, under the authority of Congress, expressed in the act of 1887 and the resolution of 1892, and as particularly directed in the resolution of 1898, set apart this space on B street for the exclusive use of the cabs of the railroad company; in other words, they have ordered that a section of a street owned and controlled by the Government shall be, under this regulation, dedicated to a particular use, which does not interfere with the ordinary and usual use of such street by the public. Is this action on the part of the Commissioners unconstitutional, unreasonable, or against public policy?

3. When it is considered that Congress has the absolute ownership of and control over the space; that the depot which abuts upon this space is erected upon property which is owned by the Government (a Government reservation), and that Congress has, and has frequently exercised, the right to subject the streets, of which this space is a part, to extraordinary uses, and that this right has been upheld by the Supreme Court of the United States (*Edmunds* v. *Railroad Co.*, 114 U. S. 453), it is difficult to see the force of the contention of the plaintiff in error, unless it be found in the assertion

that a monopoly has been created in favor of the railroad company. But an examination of the facts will show that this has not been done. There is nothing in the resolution of June, 1898, and nothing in the amended regulations made thereunder, which takes from the licensed cabman his right to follow his business in all directions. It simply says to him that in the prosecution of his business, which may be followed all over the District, he can not stand at this particular place. The other stands are open to him; his right to drive passengers to the depot is unimpaired; his right when sent for to drive up to the depot for the purpose of taking passengers from the depot is not destroyed; he simply can not stand upon the space which has been, under the direction of Congress, set apart for a cab service operated in connection with the railroad company, for the more detailed transportation of its passengers. The public is benefited by this regulation; no vested right is disturbed; no business enterprise is prohibited; no private property invaded.

4. The last and not the least important contention of the plaintiff is that if the regulation in question does create a monopoly and Congress has expressly authorized it, then the act of Congress so authorizing it is unconstitutional. The Fourteenth Amendment to the Constitution, Sec. 1, has time and again been held by the Supreme Court of the United States to be a limitation upon the power of the States. No State can deny to a citizen of the United States within its jurisdiction the equal protection of the laws; nor can it deprive any person of life, liberty, or property without due process of law. In construing this amendment, the Supreme Court has sustained the right of a State, in the exercise of its police power, to create a monopoly by granting exclusive privileges to one or more of its citizens. *Slaughter House Cases*, 16 Wall. 115.

If a State can create a monopoly, restrained as it is by the provisions of the amendment to the Constitution just referred to, it is difficult to see why Congress can not do like-

wise in a District over which it has the right of exclusive legislation. The only limitation, if any, upon the power of Congress to legislate for the District of Columbia is that contained in the Fifth Amendment to the Constitution. The only words of this amendment which can, by any theory of construction, be said to apply to a case like this are the words "nor be deprived of life, liberty or property, without due process of law."

The plaintiff in this case has not been deprived of any property in the sense contemplated by this amendment. He is merely a driver hired by the proprietor of this particular cab. The record shows that he was not the owner or proprietor of the vehicle for which a license was issued by the Commissioners, and there is nothing in the record to show that he ever made a dollar at the cab stand in question or that he has lost anything by being deprived of the right to stand there. The plaintiff at most is a mere licensee, having no vested or property interest in the cab which was licensed or in the business in which such cab was to be employed. A license is a personal privilege and is revocable at the pleasure of the party making it. *De Haro* v. *United States*, 5 Wall. 599; Hare and Wallace's Am. Lead. Cases, 736.

The regulation of the Commissioners may be construed to be a revocation of the license granted for this vehicle so far as the use of the cab stand at this railroad depot is concerned. But this was a power which the Commissioners were at liberty to exercise. By recalling or revoking their license, this plaintiff has not been deprived of his property without due process of law. Even in cases where contracts have been impaired and vested rights have been interfered with by a State in the exercise of its "police power," the Supreme Court has sustained the statute or ordinance. *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Stone* v. *Miss.*, 101 U. S. 814; *Butchers' Union* v. *Crescent City Co.*, 111 U. S. 746. Nor has the plaintiff in error been deprived of his liberty

without due process of law.   The right to follow his calling has not been denied; the manner in which such right is to be exercised has simply been regulated.   The right to refuse a license for the exercise of a profession or a calling has been held to be within the police power of the State.   *Bradwell* v. *Illinois*, 16 Wall. 139.

When the wording of this Fifth Amendment is considered in connection with the power given to Congress in Cl. 17, section 8, article 1, of the Constitution, "to exercise exclusive legislation in all cases whatsoever" over the District of Columbia, it seems to us there can be no doubt as to the power of Congress in the District of Columbia to deny to one company or individual a privilege or franchise that it has granted to another.

Mr. Justice MORRIS delivered the opinion of the Court:

The contention of the appellant is: (1) That the Joint Resolution of Congress of June 7, 1898, was unconstitutional and void; (2) That the regulation made by the Commissioners on October 20, 1898, is unconstitutional, unreasonable, contrary to public policy and void; and, (3) That the evidence failed to show that the appellant was guilty of any offense.

1. With reference to the last mentioned ground of argument, which we will proceed to consider first, we do not find that the act charged against the appellant in this case is, by any legislative enactment, municipal ordinance, or regulation made by the Commissioners, constituted a criminal offense or misdemeanor, punishable with any penalty.   We have sought in vain through the acts of Congress and the municipal ordinances and regulations of the District of Columbia to find any enactment to that effect.   The regulation of October 20, 1898, contains no penalty for its violation, even if it could be said that there was anything in the regulation which the appellant had violated; and there is nothing in the general police regulations which makes the

act of the appellant punishable in any tribunal of criminal jurisdiction.

The general police regulations in force prior to July 1, 1898, provided that the major of police should, from time to time, under the direction of the Commissioners, establish, declare and designate stands for vehicles, on the streets or other public places within the District, together with the number and kind of vehicles which might occupy such stands, and the hours within which such stands might be used, and that no vehicle should occupy such stands except in accordance with the instructions and regulations of the major of police in that regard. The amended regulations of July 1, 1898, with some apparent inconsistency, retained this provision, and yet proceeded themselves to designate the places which should be occupied as stands, among them the two streets adjoining the Baltimore and Potomac Railroad station as already indicated. Both sets of regulations provided that "any person violating any of the provisions of this article (in regard to hack stands) should, on conviction thereof, be punished by a fine," which by the later regulations was to be not less than one dollar and not more than forty dollars.

Now, nowhere in either set of regulations is there, either by express language or by the force of necessary implication, any prohibition upon one person to intrude or trespass upon a stand set apart exclusively for the use of another, for the very sufficient reason that it was not then sought to set apart any stand for the exclusive use of any person, and of course there was no penalty where there was no prohibition. When subsequently, by the regulation of October 20, 1898, it was sought to set apart a stand for such exclusive use, and no penalty was provided for any attempt by other persons to invade that use, it is very plain that no penalty provided for previously existing misdemeanors could be regarded as applicable to the new conditions. The criminal code, even in the matter of offenses against municipal regulations, can

not be enlarged in that way. The act of the appellant may have been a trespass; but it does not appear how it could have been a misdemeanor.

2. In the next place, the regulation of October 20, 1898, can not be said in any proper sense to be authorized by the Joint Resolution of Congress of June 9, 1898. The Philadelphia, Wilmington and Baltimore Railroad Company, to which the exclusive concession is made by the Commissioners in their regulation, is not in the category of railroad companies specified in the joint resolution. That company owns no station in the District of Columbia. We are not advised that it has ever been authorized by any Act of Congress to enter this District. We know, as matter of public notoriety, that it is the company which owns and operates one of the railroads extending from the city of Baltimore to the city of Philadelphia, and that it has no existence whatever by legislative recognition within the District of Columbia. The station mentioned is the station of the Baltimore and Potomac Railroad Company; and by the express language of the statute, the cab service to be established in proximity to this station is to be established by the Baltimore and Potomac Railroad Company, and not by the Philadelphia, Wilmington and Baltimore Railroad Company. That both companies, as is also matter of public notoriety, are controlled, and, it may be said, owned by one organization, a third company, the Pennsylvania Railroad Company, can make no difference in this connection. This is a penal statute in so far as it seeks to charge the appellant with a misdemeanor; and it is well settled law that penal statutes must be strictly construed. Under the joint resolution the Commissioners were not authorized to grant any such concession as is sought here to be granted to the Philadelphia, Wilmington and Baltimore Railroad Company; and to that extent at all events their regulation is null and void, and can form no basis for the prosecution of this appellant. Whether under previously existing laws they could have

granted to this railroad company an exclusive license to occupy the stand in question is of no consequence here; for they profess to have acted under the joint resolution, and this joint resolution, as we have noted, restricted the grant to the railroad companies owning the adjacent stations.

3. But while either one of these two considerations, which we have discussed, must necessarily operate to render invalid the prosecution against the appellant, and to require his discharge therefrom, it is useless to ignore the fact that both of them rest upon premises which it is in the power of the Commissioners so to modify or materially alter at any moment as to present new conditions free from the objections which we regard as fatal to the present prosecution. They may make their concession to the Baltimore and Potomac Railroad Company; and they may in express terms prohibit intrusion upon the stand by any others than the employees of that company, and prescribe a proper penalty for intrusion. And we may properly suppose that, if we fail to go farther and to decide the fundamental question in this case, they may deem it their duty, as they would have good reason to believe it was, at once to frame their regulation in such manner as that it would be unobjectionable on either of the grounds on which thus far we have held it invalid. To such new regulation the same opposition would undoubtedly be manifested; and the result would be the institution of new prosecutions and new appeals to this court. It is eminently proper, therefore, that we should determine, as far as we may, the question which is fairly presented to us of the unconstitutionality of the legislation here involved.

The power of Congress to legislate for the District of Columbia in all matters proper for legislation, whether of a general political nature or of merely municipal character, is given by the Constitution of the United States; and the extent of that power we regard as well established by judicial authority. The power is exclusive, but it is not unlimited, nor is it arbitrary. There is no place in our

governmental system for arbitrary or unlimited power. Our institutions are radically at variance with the theory of the existence of any such power anywhere in our country. In the case of *Loan Association* v. *Topeka*, 20 Wall. 622, the Supreme Court of the United States, by Mr. Justice Miller, said:

"The theory of our Government, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative and the judicial branches of these governments are all of limited and defined power. There are limitations on such power which grow out of the nature of all free governments—implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name. No court, for instance, would hesitate to declare void a statute which enacted that A and B, who were husband and wife to each other, should be so no longer, but that A should thereafter be the husband of C, and B the wife of D, or which should enact that the homestead now owned by A should no longer be his, but should henceforth be the property of B."

The power of Congress in the District of Columbia, as elsewhere throughout the Federal Union, is distinctly limited by all the express guaranties of individual right contained in the Federal Constitution. No more in the District of Columbia than anywhere else within the United States, could the legislature of the Union pass a bill of attainder or an *ex post facto* law, or dispense with trial by jury, or establish a religion, or authorize unreasonable searches. All the general limitations imposed by the Constitution upon its authority are as applicable in the District of Columbia as in any other part of the United States. And not only are these express limitations applicable, but, in the language of Mr. Justice Miller, in the case just cited, all the "implied limitations which grow out of the nature of all free governments" are equally applicable. The "*exclusive*" power of

legislation over this District which is vested in Congress by the Constitution, must be assumed to extend only to all lawful subjects of legislation; and invasions of those fundamental individual rights, which lie at the foundation of the social compact, and for the maintenance of which free governments exist, are not lawful subjects of legislation.

The Declaration of Independence is not, as has sometimes been flippantly asserted, a mere string of glittering generalities. It is a bill of rights which enters fundamentally into the structure of our Government; and the one great fundamental truth, which it seeks to enforce, is the doctrine of the equality of all men before the law. That doctrine is not again proclaimed in our Federal Constitution. It is nowhere referred to in the Constitution before the adoption of the Fourteenth Amendment. But in that Amendment it was assumed as a cardinal principle of our republican institutions, and it was made obligatory upon the States, as such, that they " should not deny to any person within their jurisdiction the equal protection of the laws." Without the equal protection of the laws republican institutions can not exist. In fact, there is no civilized government of modern times that is not based, in theory at least, upon the principle of the equal protection of the laws to all citizens, although the practice is often halting and the influences of a baneful inequality in the past have not been wholly eliminated from the political system.

Now, the theory of equal rights before the law is antagonistic to the existence of monopolies, or to the grant of exclusive privileges; for the grant of exclusive privileges to one person necessarily means the exclusion of all others from some right to which otherwise they would be entitled. Such grants, therefore, are not within the province of the legislature to make, either directly by its own act, or indirectly through concession by some subordinate authority.

It is true that for the more effectual performance of its own functions, and sometimes also in the exercise of its

police power, the State may grant privileges which practically operate as monopolies. This may occur in either one of two classes of cases. The first class is, where the State admits an individual or a corporation to aid it in the performance of some of its own public duties; as, for example, in the construction and operation of lines of railroad and telegraph, or in the supply of gas and water to cities, or in the establishment of a bank or banks in aid of its financial operations; and the second class is the case of occupations recognized to be generally dangerous or deleterious, such as the manufacture and storage of gunpowder or other explosive materials, the manufacture of soap, the slaughtering of animals for food, the sale of intoxicating liquors, and the like. With reference to the first class of cases, it is plain that no private right is injured by the concession of exclusive privilege, since there is no private right to do the act or to enter upon the business specified without the consent of the State; and with reference to the second class, the universal recognition by society that the occupation is deleterious or dangerous is sufficient warrant for the State, in defense of the public safety, to interfere for the limitation, or even absolute prohibition, of the pursuit. See *Slaughter House Cases,* 16 Wall. 36; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746, 764; *Civil Rights Cases,* 109 U. S. 3.

But where there is a business, such as are the vast majority of avocations, which all may equally pursue with benefit to themselves and to the community, which is not in itself injurious or objectionable, and which has been at all times freely pursued by those desirous to engage in it without let or hindrance or other restrictions than those demanded by the excise laws or by the safety and comfort of the community, it is not within the province of the legislature or of any subordinate authority to prohibit such business or to discriminate arbitrarily in regard to it in favor of one person and against another; for if discrimination is allowable prohibition is allowable; and both are equally obnoxious to our

-free institutions. Indeed, to our ordinary sense of justice, discrimination is more obnoxious than prohibition.

In the cases of *Cummings* v. *Missouri,* 4 Wall. 27; *Ex parte Garland,* 4 Wall. 333, and *Dent* v. *West Virginia,* 129 U. S. 114, this question came under the consideration of the Supreme Court of the United States. In the first of these cases the court, by Mr. Justice Field, said :

" The theory upon which our political institutions rest is, that all men have certain inalienable rights—that, among these, are life, liberty and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to everyone, and that in the protection of these rights all are equal before the law."

The same principle was re-enunciated in the case of *Ex parte Garland*; and in the case of *Dent* v. *West Virginia* it was still more fully elaborated by the same court, speaking through the same justice who had written the opinions in the previous cases. There it was said :

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex or condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to everyone on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and can not be arbitrarily taken from them any more than their real or personal property can be thus taken."

Similar expositions of the law might be gathered from decisions of the State courts, which are all of one accord in this matter; but it is unnecessary to multiply citations, where there is no reasonable ground of controversy.

The contention, however, is that, inasmuch as the State may make reasonable regulations for the prosecution of any business or avocation, which is a limitation that is not controverted by anyone, the provision in the present case should be regarded as a mere regulation intended to promote the public convenience, and not as an improper interference with individual rights. But we do not so understand the effect either of the joint resolution of Congress or of the regulation made by the Commissioners.

Plainly, the effect of the regulation made by the Commissioners is to give an undue preference to the railroad company, and absolutely to prohibit all other persons from engaging in a lawful and unobjectionable business at the place designated. Now, while it may be competent for the Commissioners for good cause wholly to prohibit such business at the place designated, it is not competent for them to disregard the principle of equality of right and to allow the business to be carried on by one person and to prohibit all others from engaging in it. It is candidly conceded that, if they may lawfully do this, they may equally discriminate all over the city, and may exclude all other persons than this one railroad company from engaging in the business. We can not admit the existence of any such authority in the Commissioners, or any power in Congress to grant it to them. This is precisely the kind of power which, in the cases above cited, the Supreme Court of the United States has decided not to exist in our country.

The regulation of the Commissioners, therefore, in so far as it assumes to confer exclusive privileges on the railroad company, must be regarded as void and of no force in law. And so far as the joint resolution of Congress can be construed as authorizing a concession of such exclusive privileges, that joint resolution likewise must be taken as equally obnoxious to the principle of equality and equally invalid. If, however, the joint resolution is to be construed simply as giving the railroad company the power to conduct a cab business

in the District of Columbia upon equal terms with other persons, and the principle of equality can be subserved by the assignment of a portion of the stand in question to the railroad company and of a portion to other persons, in regard to which it is unnecessary here to express an opinion, inasmuch as there is no such case before us, it is possible that the joint resolution might be taken as unobjectionable. It is evident that the Commissioners construed the resolution as authorizing them to give the preference which they gave to the railroad company; and it is this construction and the action of the Commissioners in pursuance of such construction which we regard as being in violation of the Constitution and of common right.

We do not ignore the argument of convenience that has been urged upon us, to the effect that the cab or hack service heretofore rendered in this District has been, as alleged, quite inefficient; that the service rendered by the railroad company is of a very superior character; and that it is within the scope of the police power of the State to promote the comfort and convenience of the people, as well as the public health, the public safety, the public morals, or the general good order of society, by the grant of exclusive privileges. We can readily believe that the railroad company will render most efficient and satisfactory service in the premises. It may not be improper to take judicial notice of the fact that whatever service the Pennsylvania Railroad Company, which, it is conceded, dominates and controls the other two railroad companies that have been mentioned, has heretofore undertaken to render to the public, it has performed such service with eminent satisfaction; and we are therefore justified in assuming that the service proposed to be rendered in this case under the same auspices will likewise be rendered with entire satisfaction to the public. But the question here is not one of convenience to the railroad company or its patrons, nor one of better service to the public, but one of equality of right before the law. The comfort of the

public is not to be subserved by the destruction of private right or the subversion of a fundamental principle of all free government.

The streets of the city of Washington are for the equal use of all the public; and it is violation of the fundamental principle of equality to attempt to give an exclusive privilege in them, or in any part of them, to any one person, company or organization whatsoever, to the exclusion of others equally entitled. If the service proposed to be rendered by the railroad company is of so superior character as to be entitled to supersede in the estimation of the public all other effort in the same direction by private persons, it will be easy to accomplish the desired result, and even to create a monopoly such as will not be offensive to the law, by the establishment of the service by the railroad company upon its own ground, instead of the public streets of the city, and by the manifestation there of its superiority by the way of a test in fair competition.

It is our opinion that the regulation of October 20, 1898, was not authorized by the Joint Resolution of Congress of June 7, 1898, and is therefore null and void. And we are further of the opinion that this joint resolution can not be validly or properly construed in such manner as to justify the concession by the Commissioners of any exclusive privilege in the premises.

It follows that the judgment of the Police Court, which we understand to have been substantially a judgment *pro forma*, must be *reversed*. The cause will be remanded to that court, with directions to vacate such judgment, to quash the information, and to discharge the defendant. *And it is so ordered.*